Filed 7/15/14 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| RONALD HASSO, as Trustee, etc., | |
| Plaintiff and Appellant, | G047495 |
| v. | (Super. Ct. No. 30-2009-00333066) |
| JOHN HAPKE, | ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING |
| Defendant and Appellant; | [CHANGE IN JUDGMENT] |
| CHARLES FISH INVESTMENTS, INC., et al., | |
| Defendants and Respondents | |
| _____ | |
| RONALD HASSO, as Trustee, etc., | |
| Plaintiff and Appellant, | |
| v. | G047588 |
| ROCKWATER AMERICAN MUNICIPAL FUND, LLC, et al., | (Super. Ct. No. 30-2009-00333066) |
| Defendants and Appellants. | |

Appellant John Hapke has filed a petition for rehearing in which he requests that we modify our opinion filed on June 19, 2014 to direct the trial court to

enter judgment in his favor in accordance with Code of Civil Procedure section 629. We GRANT his request for modification.

The opinion filed in this case on June 19, 2014 is hereby ORDERED modified as follows:

1. On page 60 of the opinion, in the third full paragraph, delete the following sentence: "The order denying his motion for judgment notwithstanding the verdict is moot."

2. Substitute the following new sentence in its place: "The trial court shall enter judgment in his favor."

This modification changes the judgment.

The petition for rehearing filed on July 3, 2014 is DENIED.

MOORE, J.

WE CONCUR:

O'LEARY, P. J.

RYLAARSDAM, J.

2

Filed 6/19/14 (unmodified version)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| RONALD HASSO, as Trustee, etc., | |
| Plaintiff and Appellant, | G047495 |
| v. | (Super. Ct. No. 30-2009-00333066) |
| JOHN HAPKE, | O P I N I O N |
| Defendant and Appellant; | |
| CHARLES FISH INVESTMENTS, INC., et al., | |
| Defendants and Respondents | |
| ——————————————— | |
| RONALD HASSO, as Trustee, etc., | |
| Plaintiff and Appellant, | G047588 |
| v. | (Super. Ct. No. 30-2009-00333066) |
| ROCKWATER AMERICAN MUNICIPAL FUND, LLC, et al., | |
| Defendants and Appellants. | |

Appeals from a judgment and orders of the Superior Court of Orange County, Richard W. Luesebrink, Judge.  (Retired judge of the Orange Super. Ct. assigned

by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed in part and reversed in part.

Winget, Spadafora & Schwartzberg, Brandon S. Reif, Marc S. Ehrlich and Kelsey L. Hotchkiss for Plaintiff and Appellant Ronald Hasso as trustee of the 2006 May S. Hasso Serrano Family Trust and as trustee of the 2006 Norman Hasso Family Trust.

Robert D. Feighner for Defendants and Appellants Rockwater American Municipal Fund, LLC, Rockwater Municipal Advisors, LLC and Bryan Williams.

Brown Rudnick, Joel S. Miliband and Stephen R. Cook for Defendant and Appellant John Hapke.

Krause, Kalfayan, Benink & Slavens, Vincent D. Slavens and Mary K. Wyman for Defendants and Respondents Charles Fish Investments, Inc. and Charles Fish.

\*          \*          \*

As they say, timing is everything.  In August 2007, the initial trustee of two family trusts invested millions in the Rockwater American Municipal Fund, LLC (RAM Fund)—a hedge fund engaged in municipal arbitrage.[1]  The RAM Fund was managed by Rockwater Municipal Advisors, LLC (RMA), its managing member.  In November 2007, Charles Fish Investments, Inc. (CFI) transferred its assets to Rockwater CFI, LLC, a wholly owned subsidiary of RMA, in exchange for a 15 percent interest in RMA.  CFI had an option to unwind the transaction, if its interest in RMA did not meet certain benchmark values.  The RAM Fund was devastated by the stock market crash and the trust investments were largely wiped out by 2008.  CFI exercised its option to unwind the

---

[1]     A marketing brochure described the RAM Fund as "a multi-manager municipal arbitrage fund for high net worth and institutional clients."  It explained:  "Municipal arbitrage is an investment strategy that creates two ownership interests in the same municipal bond to take advantage of the spread between long-term and short-term municipal bond interest rates."

2

transaction with RMA and Rockwater CFI, LLC, and obtained a return of the assets originally belonging to it.

The successor trustee of the trusts sued the RAM Fund, RMA, Bryan Williams (Williams), who was the founder of the RAM Fund and the chief executive officer of RMA, John Hapke (Hapke), who was the chief financial officer of the RAM Fund, CFI, and Charles Fish (Fish), who was the chairman and chief executive officer of CFI. After it had seen clips from the movie Wall Street 2 (Twentieth Century Fox 2010) and a power point presentation with eight screens captioned "Greed," a jury awarded the successor trustee a $4,640,380 judgment against the RAM Fund, RMA, Williams, and Hapke.[2] The successor trustee was unsuccessful in his attempt to obtain a judgment against CFI and Fish. The RAM Fund, RMA, and Williams (collectively, the Rockwater Defendants), on the one hand, and Hapke, on the other hand, have each filed an appeal claiming the RAM Fund was simply the victim of the market crash. The successor trustee has appealed as well, seeking to hold liable CFI and Fish, the defendants who "got away."

The judgment against RMA and Williams for actual and constructive fraudulent transfer is reversed and the judgment in favor of CFI and Fish on those causes of action is affirmed. There is no substantial evidence to show that RMA and Williams made a fraudulent transfer, within the meaning of the Uniform Fraudulent Transfer Act (Civil Code section 3439 et seq.) (UFTA), in returning CFI's assets upon unwinding.

To the extent the judgment holds the Rockwater Defendants and Hapke liable on the causes of action for fraud by intentional misrepresentation, fraud by concealment, and/or negligent misrepresentation, it is reversed. Even if the Rockwater Defendants or Hapke had made any material misrepresentations or omissions, and even if the initial trustee of the trusts had relied thereon, any such reliance would have been

---

[2]     The defendants made a collective motion for a mistrial based on the power point presentation regarding "Greed." The denial of that motion is not at issue on appeal.

3

unreasonable. For the same reason, the judgment in favor of CFI and Fish on those causes of action is affirmed.

The judgment against the RAM Fund and Hapke for breach of fiduciary duty and professional negligence is reversed, because there is no substantial evidence to show that they were investment advisers within the meaning of Corporations Code section 25009. However, the judgment against RMA and Williams on those causes of action is affirmed because there is substantial evidence to show that they were investment advisers and that they breached their fiduciary duties to the initial trustee. The judgment in favor of CFI and Fish on the breach of fiduciary duty cause of action is affirmed because there is substantial evidence to show that they did not breach any fiduciary duty.

The court's finding that CFI was not the alter ego of RMA is supported by substantial evidence. Consequently, we affirm the ruling that CFI was not liable for the debts of RMA. The ruling that Fish was not liable for the debts of CFI is moot, inasmuch as the judgment in favor of CFI on all causes of action is affirmed.

I

FACTS

A. BACKGROUND:

(1) Agreement between CFI and RMA—

CFI, Fish, RMA, and its wholly-owned subsidiary, Rockwater CFI, LLC, entered into a contribution agreement in November 2007. The contribution agreement provided that CFI would contribute certain assets to Rockwater CFI, LLC. In consideration therefor, Rockwater CFI, LLC agreed to assume certain obligations of CFI and RMA agreed to issue to CFI certain "Class B Units, representing approximately 15% of the issued and outstanding membership interests" of RMA. The contribution agreement gave CFI the option to unwind the deal as early as January 1, 2010, if its interest in RMA was worth less than certain threshold figures.

4

Also in November 2007, Fish, RMA and Rockwater CFI, LLC entered into an employment agreement, pursuant to which RMA employed Fish as a managing principal. At the same time, RMA hired CFI vice president Betsy Shelton as well.

The parties ultimately agreed to an early termination of their arrangement. An unwind agreement dated April 15, 2009 was executed by CFI, Fish, Shelton, RMA, and Rockwater CFI, LLC. The unwind agreement provided that the contribution agreement was rescinded and terminated effective May 1, 2009. As of that date, CFI and RMA returned their respective property to each other and CFI agreed to pay RMA $56,000 in settlement.

*(2) The Trusts—*

The two irrevocable trusts involved in this matter are the 2006 May S. Hasso Serrano Family Trust, created for the benefit of the descendants of May S. Hasso Serrano (Serrano), and the 2006 Norman Hasso Family Trust, created for the benefit of the descendants of Norman Hasso. Serrano and Norman Hasso are brother and sister.

The 2006 May S. Hasso Serrano Family Trust was funded by Serrano's parents. Serrano herself was neither the trustor nor the trustee. Rather, Bart Colson (Colson) was the initial trustee of each trust. He was a long-time family friend and business associate. At the end of 2009, Serrano's nephew Ronald Hasso (Hasso) took over as successor trustee.

*(3) Serrano's Characterization of Events—*

Hasso's case was built largely on Serrano's testimony, which we describe hereinafter.

Serrano has a bachelor's degree with an economics major from UCI, an MBA from UCLA, and a law degree from Pepperdine. She passed the bar exam, but never practiced law.

5

One day when Serrano was visiting Attorney Wayne Casey on an unrelated matter, he mentioned an interesting investment opportunity. Serrano asked for information about the investment.

Sometime thereafter, in April 2007, Hapke telephoned her. According to Serrano, Hapke explained that Attorney Casey had referred him and "that he had a background in investment advice" and he thought they "might be interested in some tax-free investments" for the trusts. Serrano told him that the trust was for the benefit of her young children and that the primary objective was to have a safe investment and preserve capital.

Serrano accepted the offer of Williams and Hapke to make a presentation to her at her home. In advance of the meeting, Hapke sent her a package of materials including an investment proposal for the 2006 May S. Hasso Serrano Family Trust, which she reviewed before the meeting, and a RAM Fund marketing brochure. The investment proposal allocated assets to three classifications—liquid investments, traditional municipal bonds, and the RAM Fund.

Serrano and her husband were present at the May 29, 2007 meeting, along with Williams and Hapke. Williams and Hapke gave a power point presentation and provided a hard copy of it to Serrano. According to Serrano, Williams and Hapke told her there were a lot of risks, but that they had methods for managing and minimizing them. She also said they repeatedly told her the proposed investment was low risk and appropriate for the trusts.

Williams and Hapke provided an explanation of municipal arbitrage. Serrano testified to her understanding that the bond was split into two component parts, one being the feature that paid interest over time and the other being the remainder of the bond, and that each of the two parts was sold to a different party. She understood that the remainder of the bond was to go to the RAM Fund sub-manager. Williams and Hapke did not go into detail on the identity of the sub-manager.

Serrano understood that the RAM Fund was a hedge fund. She said Williams and Hapke told her she could get an 8 to 10 percent return, but that the return was actually more beneficial than that because it was tax exempt. According to Serrano, Williams said, "'In the worst case scenario you could lose 10 percent.'" That was supposed to be "'if the world fell apart.'"

After the meeting, Hapke sent Serrano an email stating: "'Our proposed investment strategy is designed to deliver attractive returns with nominal risk, a result that seems ideally suited to the trusts.'" Within a day or two after the meeting, Serrano sent an email to Williams and Hapke telling them she was going to recommend to Colson that he follow their proposal and make an investment.

Williams sent, in care of Serrano, a letter dated June 6, 2007 addressed to Colson. The letter included a copy of the private placement memorandum with respect to the RAM Fund. Serrano confirmed that she received the letter and the copy of the private placement memorandum.

After receiving the documents, Serrano met in person with Colson. According to Serrano, she was the one who made the decision to invest, and Colson relied on her decision.

In mid-June, 2007, Colson executed subscription agreements for investment in the RAM Fund. However, before the trust money was wired in, Serrano's mother contacted her and expressed concern that some hedge funds were collapsing. She suggested that Serrano check into whether the hedge fund the trusts were investing in was affected. Serrano then contacted Hapke, and asked whether the investment had become more risky because of an unstable market.

In response, Hapke sent Serrano a June 25, 2007 e-mail with a market update attached and the two of them also spoke. According to Serrano, Hapke reassured her that everything was alright and the investment was still safe and appropriate for the trusts.

7

Colson wired the trust money around August 6 or 8, 2007. By the following month, Serrano learned that the investment of each trust had already lost money. Around February 2008, Serrano asked for a return of principal. However, the investments were subject to a two-year lockup and could not then be returned.

Serrano and Williams met in March 2008. She then found out that there had been leveraging and margin calls and the trust investments basically had been wiped out. Sometime in 2009, Serrano learned that a decision had been made to wind up the RAM Fund. She thought the trusts had lost roughly $2.5 million apiece.

*(4) Trust Investment Documentation—*

On June 13, 2007, Colson as trustee executed a RAM Fund subscription agreement for each trust. He invested $3,000,000 in the RAM Fund on behalf of each of the two trusts. The RAM Fund signed the subscription agreements on August 1, 2007. Colson only invested trust monies in the RAM Fund. He did not invest in any traditional bonds or liquid investments managed by CFI.

*B. PROCEDURAL HISTORY:*

Hasso filed a second amended complaint on behalf of the trusts. He alleged that the defendants engaged in investment fraud and related wrongful activity by enticing Colson, the prior trustee of the trusts, to invest $3 million of each trust's assets into the RAM Fund. He further alleged that the nature of the RAM Fund was misrepresented, that it was not a suitable investment for the trusts, and that each trust lost at least $2.4 million, or 80 percent.

The case was tried in three phases. In the first phase, a jury trial was held on causes of action for: (1) breach of fiduciary duty; (2) fraud by intentional misrepresentation; (3) fraud by concealment; (4) actual fraudulent conveyance; (5) constructive fraudulent conveyance; (6) professional negligence; and (7) negligent misrepresentation. The jury found in favor of CFI and Fish on all causes of action

8

against them.  It found all other defendants liable on multiple causes of action.  In short, Hasso prevailed on each cause of action as against more than one defendant, excluding CFI and Fish.

In the second phase, the issue of whether to award punitive damages against either Williams or RMA was tried before a jury.  The jury awarded no punitive damages.  In the third phase, the issues of alter ego and/or single enterprise liability with respect to Fish and CFI were tried before the court.  The court held that CFI and RMA were not a single enterprise and that CFI was not the alter ego of Fish.

The judgment held the Rockwater Defendants and Hapke jointly and severally liable in the amount of $4,640,380.  It further held that Hasso take nothing from either CFI or Fish.

The Rockwater Defendants filed both a motion for judgment notwithstanding the verdict and a new trial motion.  The court denied the motion for judgment notwithstanding the verdict.  It granted the new trial motion as to the causes of action for actual and constructive fraudulent conveyance, but as to damages issues only.

Hapke also filed both a motion for judgment notwithstanding the verdict and new trial motion.  The court denied both of Hapke's motions.

Hasso filed a motion for judgment notwithstanding the verdict to set aside the portion of the judgment in favor of CFI and Fish.  He also filed a new trial motion with respect to CFI and Fish.  The court denied each of Hasso's motions.

Hasso filed a notice of appeal from:  (1) the portions of the judgment in favor of CFI and Fish and denying Hasso's equitable claims; (2) the order denying Hasso's motion for judgment notwithstanding the verdict; (3) the order denying Hasso's new trial motion; and (4) the order granting in part the new trial motion of the Rockwater Defendants with respect to the causes of action for actual and constructive fraudulent conveyance.

9

The Rockwater Defendants filed a cross-appeal from the judgment and from the orders denying their motion for judgment notwithstanding the verdict and denying in part their new trial motion.

Hapke filed a notice of appeal from the judgment, the order denying his motion for judgment notwithstanding the verdict, and the order denying his new trial motion. However, in his opening brief on appeal, he challenges only the judgment and the order denying his motion for judgment notwithstanding the verdict.

This court, on its own motion, consolidated the appeals.

II

DISCUSSION

A. *STANDARDS OF REVIEW:*

"The trial court's power to grant a motion for judgment notwithstanding the verdict is the same as its power to grant a directed verdict. (Code Civ. Proc., § 629.) 'A motion for judgment notwithstanding the verdict may be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence in support.' [Citations.] On appeal from the denial of a motion for judgment notwithstanding the verdict, we determine whether there is any substantial evidence, contradicted or uncontradicted, supporting the jury's verdict. [Citations.] If there is, we must affirm the denial of the motion. [Citations.] If the appeal challenging the denial of the motion for judgment notwithstanding the verdict raises purely legal questions, however, our review is de novo. [Citation.]" (*Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1138.)

"We defer to the trial court's factual determination when the court grants a motion for new trial, not when the court denies such a motion. When the court denies the motion, we presume the jury's verdict is correct. [Citation.]" (*Mammoth Lakes Land Acquisition, LLC v. Town of Mammoth Lakes* (2010) 191 Cal.App.4th 435,473.)

"Code of Civil Procedure section 657 states: 'A new trial shall not be granted upon the ground of insufficiency of the evidence to justify the verdict or other decision, nor upon the ground of excessive or inadequate damages, unless after weighing the evidence the court is convinced from the entire record, including reasonable inferences therefrom, that the court or jury clearly should have reached a different verdict or decision.' A trial court has broad discretion in ruling on a new trial motion, and the court's exercise of discretion is accorded great deference on appeal. [Citation.]" (*Fassberg Construction Co. v. Housing Authority of City of Los Angeles* (2007) 152 Cal.App.4th 720, 751-752.)

## B. PRELIMINARY MATTER—EFFECT OF HASSO'S ABANDONMENT OF APPEAL FROM ORDER GRANTING NEW TRIAL AS TO DAMAGES ONLY:

The Rockwater Defendants filed a cross-appeal from the judgment and from the orders denying their motion for judgment notwithstanding the verdict and denying in part their new trial motion.

Hasso entreats us to ignore the cross-appeal of the Rockwater Defendants. He reminds us that, in his own notice of appeal, he challenged the court's order granting, with respect to damages issues only, the motion of the Rockwater Defendants for a new trial on the fraudulent transfer claims.[3] However, as Hasso readily admits, he has not challenged the order in his opening brief on appeal. Consequently, his challenge to that order is deemed abandoned. (*G.R. v. Intelligator* (2010) 185 Cal.App.4th 606, 610, fn. 1.) Hasso argues that because he is not pursuing an appeal from the order for a partial

---

[3]  The court in *Cobb v. University of So. California* (1996) 45 Cal.App.4th 1140 addressed the situation where there has been a "grant of a partial new trial after determination of all issues in a matter." (*Id.* at p. 1144.) It stated: "If a new trial is ordered as to some issues but not as to others (for example, to retry the issue of damages but not of liability), the order granting the new trial is appealable by any party aggrieved by the order, including the moving party who sought a new trial as to all issues. [Citations.]" (*Ibid.*)

new trial on damages, and the Rockwater Defendants to do not appeal from it either, their protective cross-appeal is moot. He cites *Marshall v. Brown* (1983) 141 Cal.App.3d 408 and *Sandco American, Inc. v. Notrica* (1990) 216 Cal.App.3d 1495.

The Rockwater Defendants, however, assert that even though no one is challenging that particular order on appeal, this court still has jurisdiction over their appeal from the order denying their motion for judgment notwithstanding the verdict and from the order denying their new trial motion as to liability issues. As stated in *Saxena v. Goffney* (2008) 159 Cal.App.4th 316, "An appeal may be taken from an order denying a motion for JNOV even where the trial court has granted, or denied, a new trial motion. [Citations.]" (*Id.* at p. 324.) Furthermore, they emphasize that where the allegations and evidence are insufficient to establish liability, the court may resolve the protective cross-appeal in the interests of judicial economy. They cite *Adams v. City of Fremont* (1998) 68 Cal.App.4th 243, wherein the court stated: "When parties file both an appeal from an order granting a new trial and a protective appeal from the judgment, we generally consider the appeal from the new trial order first. [Citations.] However, where the appeal from the judgment shows that the allegations and proof of the plaintiff are insufficient to establish liability, we may depart from this normal procedure because affirmance of the order granting new trial will simply continue wasteful litigation, while reversal of the judgment will terminate it on the merits. [Citation.]" (*Id.* at p. 261, fn. 15.)

The foregoing rule applies in this instance. For reasons we shall show, the judgment holding RMA and Williams liable on the fraudulent conveyance causes of action must be reversed. Consequently, the issues pertaining to the award of damages on those causes of action are moot. We will address the issues the Rockwater Defendants raise in their protective cross-appeal.

12

## C. FRAUDULENT CONVEYANCE:

### (1) Allegations and Procedural History—

Hasso's causes of action for actual and constructive fraudulent conveyance were based on the unwinding of the contribution agreement between CFI, Fish, RMA, and Rockwater CFI, LLC. Hasso alleged that CFI and Fish paid no consideration for the unwinding of the contribution agreement. His second amended complaint stated: ". . . CFI and Fish were able to unwind the merger, transfer RMA property and clients to CFI and effectively strip RMA of all of its assets and revenue sources rendering RMA insolvent. Such acts were done with the intent to hinder, delay or defraud Plaintiffs of their investment capital, commissions, placement fees, management fees, performance fees, service charges and other fees."

The jury found that RMA and Williams were liable on both the actual and constructive fraudulent conveyance causes of action, but that CFI and Fish were not liable on either cause of action. It found that the value of the property transferred was "$1,937,201.53 annually." (Boldface omitted.)

Hasso, in his motion for judgment notwithstanding the verdict and new trial motion, argued: (1) inasmuch as the jury found RMA and Williams liable for actual and constructive fraudulent conveyance, it was necessarily required to find CFI and Fish liable as well; and (2) the evidence compelled a finding that CFI and Fish were liable for actual and constructive fraudulent conveyance. Hasso renews his arguments on appeal, contending CFI and Fish should be held liable for actual and constructive fraudulent conveyance.

In their motion for judgment notwithstanding the verdict, the Rockwater Defendants argued: (1) there was no substantial evidence of an asset transfer under the UFTA because income not yet earned under a management agreement is not an asset; and (2) there was no substantial evidence of the value of the property transferred because there was no evidence of the amount of fees CFI charged under the management

13

agreements. In their new trial motion, the Rockwater Defendants reiterated the foregoing arguments and added that the finding of a fraudulent conveyance was contrary to law.

On appeal, the Rockwater Defendants maintain that the judgment on the fraudulent conveyance claims cannot stand because: (1) the future management fees of CFI were not an asset within the meaning of the UFTA; and (2) there was insufficient evidence to support the damages award.

*(2) Uniform Fraudulent Transfer Act—*

Under the UFTA, "a transfer of assets made by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer, if the debtor made the transfer (1) with an actual intent to hinder, delay or defraud any creditor, or (2) without receiving reasonably equivalent value in return, and either (a) was engaged in or about to engage in a business or transaction for which the debtor's assets were unreasonably small, or (b) intended to, or reasonably believed, or reasonably should have believed, that he or she would incur debts beyond his or her ability to pay as they became due. (Civ. Code, § 3439.04[, subd. (a)(1),(2)]; [citation].) A transfer by a debtor is fraudulent as to creditors whose claims arose *before* the transfer if the debtor made the transfer (1) without receiving reasonably equivalent value in exchange, and (2) either (a) was insolvent at the time of the transfer, or (b) became insolvent as a result of the transfer. (Civ. Code, § 3439.05.)" (*Monastra v. Konica Business Machines, U.S.A., Inc.* (1996) 43 Cal.App.4th 1628, 1635.) A transfer described in Civil Code section 3439.04, subdivision (a)(1) is characterized as actual fraud, and a transfer described in either Civil Code section 3439.04, subdivision (a)(2) or Civil Code section 3439.05 is characterized as constructive fraud. (Cf. *Mejia v. Reed* (2003) 31 Cal.4th 657, 661, 664; Civ. Code, § 3439.04, as amended by Stats. 2004, ch. 50, § 1.)

"A creditor who is damaged by a transfer described in either Civil Code section 3439.04 or Civil Code section 3439.05 can set the transfer aside or seek other appropriate relief under Civil Code section 3439.07 [Citation.] A transfer that would

14

otherwise be voidable as intentionally fraudulent under section 3439.04, subdivision (a)[(1)], is not voidable against a transferee who took in good faith and for a reasonably equivalent value. (Civ. Code, § 3439.08, subd. (a).)" (*Monastra v. Konica Business Machines, U.S.A., Inc.*, *supra*, 43 Cal.App.4th at pp. 1635-1636.)

*(3) Evidence of Transfer—*

According to Hasso, the property transferred was the business that generated management fees, as he puts it, "the management fees on CFI investor assets." He claims the management of those investor assets was collusively transferred "back to CFI" upon a premature unwinding of the contribution agreement, and that the creditors of RMA were thereby denied an income stream upon which to levy.

The parties say little about the evidence pertaining to the nature of the property transferred either to or from RMA. However, we observe that Williams testified on the point.

Williams testified that when RMA acquired the assets of CFI, in November 2007, it made no payments to the owners of the company. The only consideration for the transaction was providing those owners with an equity interest in RMA. He further stated that after the transaction took place, Fish continued "running the assets that came over from CFI."

Williams made clear that, upon rewinding, RMA did not pay anything to CFI for the return of CFI's ownership interest in RMA, which he said still had some value. And, CFI did not pay anything for the retrieval of the assets it had previously contributed. Williams further testified that the unwind transaction was simply the returning to CFI of the "the clients and the desks and the copiers back to them. . . . Because they were what went in, and they were what went out." In terms of cash outlay, Williams himself put in several hundred thousand dollars of his own to meet payroll and assist with other things and CFI agreed to pay a share of that, amounting to $56,000.

15

And, let us not forget that the right to unwind was a negotiated provision of the contribution agreement.

*(4) Evidence of Value—*

In their motions, the Rockwater Defendants argued that Hasso had failed to present any evidence whatsoever to show that the management agreements had value. They said that the jury's finding that the property transferred was "$1,937,201.53 annually" was derived from the rebuttal argument Hasso's counsel made before the jury. (Boldface omitted.) Counsel argued that CFI's assets under management had a value of $553,486,150 and that CFI charged 35 basis points (35/100 of one percent) for its management fee. So, counsel argued, the value of CFI's total annual management fees was $1,937,201.53.

The Rockwater Defendants asserted in their motions that there was no evidence whatsoever to support counsel's argument. CFI and Fish, in their oppositions to Hasso's motions, also called the argument of counsel "baseless." The parties renew their arguments on appeal. Indeed, Hasso has not cited any evidence that supports the figure his counsel put to the jury.

However, Hasso points out that the record is not devoid of any evidence relevant to a determination of the amount of annual management fees generated on CFI investor assets. Williams testified that CFI had about $440 million in investor assets that it was managing before it transferred its assets to RMA. Also, when Williams and Hapke made their presentation to Serrano and her husband, the proposal they presented showed that CFI would charge 35 basis points for any assets they were to manage for the trusts, with fees to be paid quarterly in advance. At trial, Fish was asked whether the proposal provided to Serrano on May 29, 2007 described "the fee structure for CFI at that time," and Fish replied that it did.

The foregoing evidence does not establish the amount of investor assets transferred back to CFI on unwinding. It also does not establish whether the fee structure

16

available to new clients in May 2007 was the same as the fee structure in effect with respect to all investor accounts, some of which may have been opened many years earlier. It certainly does not quantify the amount of fees that were earned during the period between the date of the actual unwinding and the date originally set in the contribution agreement, arguably the only relevant period of time. However, it does dispel the notion that Hasso failed to present any evidence whatsoever pertaining to the value of annual management fees on CFI investor assets.

In any event, given the lack of substantial evidence to support the damages award, the court granted the new trial motion as to damages. The court stated "the evidence supporting the damage award was confused and inadequate and the jury was inadequately instructed on the law concerning the measure and amount of damages recoverable as a result of the fraudulent conveyances . . . ." It did not, however, either grant the motion for a new trial as to liability or the motion for judgment notwithstanding the verdict.

The rulings and the judgment are unsupportable absent an implied finding that the portfolio of management agreements must necessarily have had some value, even though the evidence was insufficient to establish what that value was. That begs the question, however: How can it be determined that there was a transfer of an asset without the receipt of reasonably equivalent value in exchange therefor if there is insufficient evidence to establish the value of the asset transferred (not to mention the value of the assets received in exchange)? (Civ. Code, §§ 3439.04, 3439.05.)

*(5) Definition of Asset—*

Issues of value aside, the Rockwater Defendants, CFI and Fish contend that Hasso failed to prove that any asset, within the meaning of the UFTA, was transferred to CFI. Citing *Mejia v. Reed*, *supra*, 31 Cal.4th 657, they say Hasso based his claim of fraudulent transfer on the purported transfer of management fees, but that management fees are not assets within the meaning of the UFTA.

17

In *Mejia v. Reed*, *supra*, 31 Cal.4th 657, a husband had transferred certain property to his wife pursuant to a marital settlement agreement. The court addressed, inter alia, whether property transferred pursuant to a marital settlement agreement was subject to the UFTA. The court held that it was. (*Id.* at p. 661.) It further addressed whether the husband was rendered insolvent by the transfer of property to his wife. The issue was whether solvency should be determined by weighing the husband's future child support obligations, discounted to present value, against his future earnings. (*Id.* at pp. 670-671.) In this context, the court stated, "Income not yet earned . . . is not an asset under the UFTA unless it is subject to levy by a creditor, as would be the case if, for example, the transferor possessed a promissory note payable at a future date. (See Civ. Code, § 3439.01, subd. (a)(2); [citation].) Thus, Husband's future earnings, or his future earning capacity, would not appear on the balance sheet to offset his child support obligation." (*Mejia v. Reed*, *supra*, 31 Cal.4th at p. 671.)

Notice that the question in *Mejia v. Reed*, *supra*, 31 Cal.4th 657 was not whether the husband's future earnings could be levied upon. The court did not decide that issue. The Rockwater Defendants quote the portion of the sentence stating "[i]ncome not yet earned . . . is not an asset under the UFTA," but they omit the qualifier "unless it is subject to levy by a creditor . . ." and the court's citation to Civil Code section 3439.01, subdivision (a)(2). (*Mejia v. Reed*, *supra*, 31 Cal.4th at p. 671.) Civil Code section 3439.01, subdivision (a)(2) provides that the term "asset," within the meaning of the UFTA, excludes property "generally exempt under nonbankruptcy law." The court implied that one cannot levy upon wages that have not yet been earned. (*Mejia v. Reed*, *supra*, 31 Cal.4th at p. 671.) Query whether the same is true as to fees generated under existing management agreements.

The Rockwater Defendants, CFI and Fish do not specifically address this issue. That does not mean, however, that they have failed to address the statutes that answer the question of whether, under the facts of this case, the transfer of the portfolio

18

of management agreements, together with future fees to be earned thereon, constituted the transfer of an asset within the meaning of the UFTA.

Civil Code section 3439.01, subdivision (i) defines a "transfer," for the purposes of the UFTA, as a "mode . . . of disposing of . . . an asset . . . ." Section 3439.01, subdivision (a)(1) defines an "asset" as "property of a debtor" excluding "[p]roperty to the extent it is encumbered by a valid lien." Civil Code section 3439.01, subdivision (f), in turn, defines a "lien" as "a charge against or an interest in property to secure . . . performance of an obligation, and includes a security interest created by agreement, a judicial lien obtained by legal or equitable process or proceedings, a common-law lien, or a statutory lien."

CFI and Fish argued in opposition to Hasso's motions that CFI's option to unwind the contribution agreement and receive a return of its assets was tantamount to a lien against those assets.[4] In other words, the property returned to CFI did not constitute an "asset" within the meaning of the UFTA, because it was subject to a lien. (Civ. Code, § 3439.01, subds. (a)(1),(f).) They renew this argument on appeal.

Hasso argues that the jury must have found there was no lien, or it could not have held RMA and Williams liable. It is equally arguable that the very reason the jury did not hold Fish or CFI liable is because it did indeed find there *was* a lien. In any event, the interpretation of the statutes at issue and their application to the contribution agreement and the unwind agreement are questions of law we determine de novo. (*Wimberly v. Derby Cycle Corp.* (1997) 56 Cal.App.4th 618, 625, fn. 3; *Wolf v. Walt Disney Pictures & Television*, *supra*, 162 Cal.App.4th at p. 1138; *Harbor Island Holdings v. Kim* (2003) 107 Cal.App.4th 790, 794.)

---

[4] Interestingly, we see no indication that the Rockwater Defendants, in their motions, made the same argument—that they released property that was in effect subject to a lien in favor of CFI. However, the Rockwater Defendants did cite Civil Code section 3439.01, as well as related sections 3439.03, 3439.04 and 3439.05, albeit without much analysis of the same.

19

We conclude that the interpretation of CFI and Fish is correct. When CFI entered into the transaction with RMA, it contributed its assets in exchange for an ownership interest in RMA coupled with a right to a return of assets if the value of its ownership interest in RMA was compromised. It clearly had a documented right, supported by consideration, to seize those assets, a right that predated both the financial calamity that gave rise to this lawsuit and, indeed, the lawsuit itself. We construe CFI's right as "an interest in property to secure . . . performance of an obligation," or a "lien," within the meaning of Civil Code section 3439.01, subdivision (f).

Because property subject to a valid lien does not constitute an "asset" within the meaning of Civil Code section 3439.01, subdivision (a)(1), and a "transfer" within the meaning of Civil Code section 3439.01, subdivision (i) means the transfer of an "asset," there was no "transfer" to trigger the application of Civil Code sections 3439.04 and 3439.05. Consequently, there was no evidence to show either that RMA and Williams made a fraudulent transfer of assets within the meaning of the UFTA or that CFI received assets pursuant to such a fraudulent transfer.

The judgment against RMA and Williams for actual and constructive fraudulent conveyance must be reversed. The orders on the motions of the Rockwater Defendants for judgment notwithstanding the verdict and for new trial as to the fraudulent transfer causes of action are moot. The judgment in favor of CFI and Fish with respect to the fraudulent transfer causes of action must be affirmed. The orders denying Hasso's motions for judgment notwithstanding the verdict and new trial on those causes of action, must be affirmed.

D. FRAUD AND MISREPRESENTATION:

(1) Causes of Action—

We first note the elements of the various fraud and misrepresentation causes of action at issue here. A cause of action for fraud contains "the following

20

elements:  (1) a knowingly false representation by the defendant; (2) an intent to deceive or induce reliance; (3) justifiable reliance by the plaintiff; and (4) resulting damages. [Citation.]"  (*Service by Medallion, Inc. v. Clorox Co.* (1996) 44 Cal.App.4th 1807, 1816.)

"[T]he elements of an action for fraud . . . based on concealment are:  (1) the defendant must have concealed or suppressed a material fact, (2) the defendant must have been under a duty to disclose the fact to the plaintiff, (3) the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, (4) the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact, and (5) as a result of the concealment or suppression of the fact, the plaintiff must have sustained damage.  [Citation.]" (*Marketing West, Inc. v. Sanyo Fisher (USA) Corp.* (1992) 6 Cal.App.4th 603, 612-613.)

The elements of negligent misrepresentation are:  "'[M]isrepresentation of a past or existing material fact, without reasonable ground for believing it to be true, and with intent to induce another's reliance on the fact misrepresented; ignorance of the truth and justifiable reliance on the misrepresentation by the party to whom it was directed; and resulting damage.  [Citation.]'  [Citation.]" (*Shamsian v. Atlantic Richfield Co.* (2003) 107 Cal.App.4th 967, 983.)

*(2)  Introduction—*

The jury found Hapke and each of the Rockwater Defendants liable for fraud by intentional misrepresentation and for negligent misrepresentation.  It also found Hapke, RMA, and Williams (but not the RAM Fund) liable for fraud by concealment.  It did not find either CFI or Fish liable on any of these causes of action.

Hasso appeals from the judgment in favor of CFI and Fish, claiming they were liable for the material misrepresentations and omissions of their colleagues.  In addition, he appeals from the orders denying a judgment notwithstanding the verdict and a new trial with respect to the judgment in favor of CFI and Fish.

21

Hapke and the Rockwater Defendants also appeal, claiming the judgment against them on the fraud and misrepresentation causes of action was erroneous because: (1) Colson, as the trustee who made the investments on behalf of the trusts, did not rely on any representations; (2) any reliance would not have been reasonable; (3) Hasso, as successor trustee and plaintiff, failed to show causation; and (4) Hasso failed to present evidence in support of damages.

Hasso says there was substantial evidence to show that Hapke and the Rockwater Defendants misrepresented the risks and the characteristics of the RAM Fund to Serrano as Colson's representative, and that this worked a fraud upon Colson under both agency and indirect misrepresentation theories. Hasso also claims that each of Serrano and Colson reasonably relied on the misrepresentations and that the misrepresentations were the proximate cause of the investment losses.

*(3) Effect of Representations Made to Serrano—*

We start with the question of how representations made to Serrano could work a fraud on Colson, the trustee who made the trust investments.

*(a) Agency theory*

Hasso claims the purported misrepresentations to Serrano worked a fraud upon the trusts under agency principles, because Colson had appointed her his representative to evaluate the investment proposal and make recommendations thereon. He further contends this would be true even if Serrano had never actually communicated the misrepresentations to Colson. In support of this position he cites *Grinnell v. Charles Pfizer & Co.* (1969) 274 Cal.App.2d 424, *Toole v. Richardson-Merrell Inc.* (1967) 251 Cal.App.2d 689, and *Roberts v. Salot* (1958) 166 Cal.App.2d 294.

*Grinnell v. Charles Pfizer & Co.*, *supra*, 274 Cal.App.2d 424 and *Toole v. Richardson-Merrell Inc.*, *supra*, 251 Cal.App.2d 689 were each cases arising out of lawsuits against drug manufacturers with respect to the sale and marketing of dangerous drugs. In each case the doctors who prescribed or administered the drugs relied upon

22

misinformation about their safety. The doctors were construed as the agents of the patient-plaintiffs. The triers of fact were permitted to infer that the doctors read the package inserts at issue and relied thereon in prescribing the drugs for the patients. However, the doctors were the ones who made the ultimate decisions and took action in response to the representations. (*Grinnell v. Charles Pfizer & Co.*, *supra*, 274 Cal.App.2d at p. 441; *Toole v. Richardson-Merrell Inc., supra,* 251 Cal.App.2d at p. 707.)

Those cases are distinguishable from the one before us. In *Grinnell v. Charles Pfizer & Co.*, *supra*, 274 Cal.App.2d 424 and *Toole v. Richardson-Merrell Inc.*, *supra*, 251 Cal.App.2d 689, the agent to whom the communications were made was the one who evaluated the information and took action upon it, in the form of prescribing the drugs. Contrast the situation before us where the purported agent, Serrano, was an intermediary who gathered information for Colson—the one who reviewed and evaluated the documentation provided to him before taking action upon it in the form of executing the subscription agreements and transmitting the investment monies.

*Roberts v. Salot*, *supra*, 166 Cal.App.2d 294 is also distinguishable from the case before us. There, a 70-year-old infirm man with limited education borrowed against his property in order to assist his daughter, who apparently needed money. The daughter was responsible for repaying the loan. When she fell behind in her payments and a foreclosure was scheduled, the father left it to the daughter to address the matter and find a replacement loan. The daughter fell in with a shyster who prepared documents by which he ultimately divested the father of the property. The shyster made false representations to the daughter, who relied upon them, took the documents to her father, and had him sign them. (*Id.* at p. 297.) The court stated in a cursory way that a fraud had been worked against the daughter, and thus her father, inasmuch as she was his agent in the transaction. (*Id.* at p. 300.) However, there was no discussion of whether any misrepresentations were communicated to the father, whether the father relied upon any

23

misrepresentations, or even whether he knew the nature of the documents he was signing. Contrast the case before us, where Serrano gathered information and relayed it to Colson, a competent, highly successful businessman who discussed the investment with Serrano and reviewed the written documentation, including the private placement memorandum, executed the subscription agreement, and forwarded the funds.

As more recent cases show, liability for a fraud worked on an agent is imposed where it is the agent who not only places reliance on the misrepresentations, but also makes the decision and takes action based upon the misrepresentations. (See *City of Industry v. City of Fillmore* (2011) 198 Cal.App.4th 191, 212-213 [State Board of Equalization as agent allocated insufficient share of sales tax to plaintiff cities based on misrepresentations]; *Thrifty-Tel, Inc. v. Bezenek* (1996) 46 Cal.App.4th 1559, 1567-1568 [computer system as agent accepted improperly obtained access codes and permitted long distance calls].) As stated in *Lovejoy v. AT&T Corp.* (2001) 92 Cal.App.4th 85, "a fraudulent misrepresentation is actionable if it was communicated to an *agent* of the plaintiff and was acted upon *by the agent* to the plaintiff's damage." (*Id.* at p. 95, italics added.) That rule is inapplicable here. In the present case, it was not Serrano, but Colson as trustee, who was responsible for evaluating the information, and who took action by executing the necessary documents and transmitting the funds.

*(b) Indirect misrepresentation theory*

That is not the end of the analysis, however. Hasso offers another rule of law that does apply here. As he observes, *Mirkin v. Wasserman* (1993) 5 Cal.4th 1082 provides the following rule with respect to indirect misrepresentations, as alleged in the matter before us: "'The maker of a fraudulent misrepresentation is subject to liability for pecuniary loss to another who acts in justifiable reliance upon it if the misrepresentation, although not made directly to the other, is made to a third person and the maker intends or has reason to expect that its terms will be repeated or its substance communicated to the other, and that it will influence his conduct in the transaction or type of transactions

24

involved.'" (*Id.* at p. 1095; accord, *Gawara v. United States Brass Corp.* (1998) 63 Cal.App.4th 1341, 1350.)

*(i) intention for representations to reach Colson*

Williams testified that, at the time of the initial meeting with Serrano and her husband, he hoped that the information he provided would be forwarded to Colson and that Colson would invest in the RAM Fund. Following the meeting, he sent a letter dated June 6, 2007 addressed to Colson, in care of Serrano. In that letter he included copies of: (1) a private placement memorandum; (2) an investment questionnaire; (3) an investor information sheet; and (4) a subscription agreement. It is clear Williams intended that his representations regarding the RAM Fund to be transmitted to Colson, through Serrano, and that Colson rely thereon in investing in the RAM Fund.

The same is true with respect to Hapke. Hapke testified that he was aware Colson was the trustee of the trusts and that he thought of Serrano as the contact person for the trusts who would evaluate investments and make recommendations to Colson as trustee. The next question then, is whether Serrano conveyed the representations to Colson.

*(ii) conveyance of representations to Colson*

Colson said that Serrano called him about the investment after she met with Williams and Hapke, and that he and Serrano got together. He acknowledged that he received copies of the investment proposal, the power point presentation, the private placement memorandum, an investment questionnaire, an investor information sheet, and a subscription agreement.

Colson testified: "I think what gave me the most comfort was the amount of time that [Serrano] spent working on this and the level she felt she understood what she was told and was represented by RAM and CFI." Colson said the two of them "talked about [the investment] for six to eight weeks." He further stated that he would not have made any investment without Serrano's approval. Given this testimony, the jury

25

could properly infer that Serrano, who met with Colson, transmitted the written documentation to him, and talked to him about the investment for six to eight weeks, also conveyed to him the various oral representations of Williams and Hapke.

*(4) Reliance—*

*(a) Actual reliance*

We turn then, to the question of actual reliance. As the California Supreme Court has stated plainly enough: ". . . California law does not permit plaintiffs to state a cause of action for deceit without pleading actual reliance . . . ." (*Mirkin v. Wasserman, supra*, 5 Cal.4th at p. 1100.) "Reliance exists when the misrepresentation or nondisclosure was an immediate cause of the plaintiff's conduct which altered his or her legal relations, and when without such misrepresentation or nondisclosure he or she would not, in all reasonable probability, have entered into the contract or other transaction. [Citations.]" (*Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1239.)

The Rockwater Defendants insist there is no evidence that Colson relied on any of the purported misrepresentations. However, Serrano testified that Colson asked her to look at the investments on his behalf. She further testified that she was the one who made the decision to invest, and that Colson relied on her decision. Colson did not put it that way. However, Colson testified that while he had not asked Serrano to act as a financial adviser to the trusts, he told her if she was comfortable with the investment based on the research she had done, then he was comfortable with it. From this, the jury could have inferred that Colson relied on Serrano's analysis, based on everything she had heard, including information she had obtained from Williams and Hapke. (Cf. *Gormly v. Dickinson* (1960) 178 Cal.App.2d 92, 105.)

*(b) Reasonable reliance*

That brings us to the question of whether Colson's reliance on the indirectly conveyed representations was reasonable. "[A] plaintiff who hears an alleged

26

misrepresentation indirectly must still show 'justifiable reliance upon it . . . .' [Citation.]" (*Mirken v. Wasserman*, *supra*, 5 Cal.4th at p. 1096, fn. omitted; accord, *Gawara v. United States Brass Corp.*, *supra*, 63 Cal.App.4th at p. 1350.) "[T]he reasonableness of the reliance is ordinarily a question of fact. [Citations.] However, whether a party's reliance was justified may be decided as a matter of law if reasonable minds can come to only one conclusion based on the facts. [Citation.]" (*Guido v. Koopman* (1991) 1 Cal.App.4th 837, 843.) "In determining whether one can reasonably or justifiably rely on an alleged misrepresentation, the knowledge, education and experience of the person claiming reliance must be considered. [Citations.]" (*Id.* at pp. 843-844; accord, *OCM Principal Opportunities Fund, L.P. v. CIBC World Markets Corp.* (2007) 157 Cal.App.4th 835, 856.)

We must, of course, take a look at the purported misrepresentations and omissions before we can determine whether Colson's reliance was reasonable.

*(i) characterization of market*

There was a point at which Serrano paused to double check whether it was appropriate to make the investment at all. Hasso points out that, before Colson wired the monies to the RAM Fund, Serrano, on the advice of her mother, asked Hapke about the stability of the market.

In response, Hapke sent Serrano a June 25, 2007 e-mail with a market update attached, and the two of them also spoke. The market update, prepared by Williams,[5] had to do with the "recent Bear Stearns market event" (capitalization omitted) and it distinguished between the municipal arbitrage market and the mortgage

---

[5] In preparing this market update, Williams relied on information from two sources. One was Ben Bernanke, the head of the Federal Reserve. According to Williams, Bernanke had said in testimony before Congress "that he believed that the subprime market problems were contained." Also, Williams learned from a conference call with the chief financial officer of one of the largest bond insurers that the subprime problem was "'not going to be a problem with [his] company's reserves.'" Given the information from these two sources, Williams believed everything was okay.

collateralized debt obligation market.  It stated:  "The current fiscal health of states and municipalities that issue tax-exempt debt is very strong . . . ."  According to Serrano, Hapke assured her that that everything was alright and the investment was still safe and appropriate for the trusts, but that turned out not to be the case.

Expert witness Christopher Taylor said what had happened at the time of the June 25, 2007 e-mail "was two Bear Stearns Funds that invested in mortgage-backed securities, not munis, mortgage-backed securities, had collapsed."  According to Taylor, the collapse did not affect the municipal bond arbitrage market at all at that point.  Taylor thought the market update provided in response to Serrano's e-mail "was a very good discussion of what was going on at the time."  He also testified to his belief that none of the statements in the market update were incorrect.  Given the testimony of Taylor, there is simply no indication that Williams or Hapke made any misrepresentations at all in communicating with Serrano concerning the perceived stability of the market at that moment in time.

*(ii) leverage*

Hasso asserts that the Rockwater Defendants failed to explain, at the May 29, 2007 meeting, that the RAM Fund would invest in sub-funds which employed leveraged municipal arbitrage strategies with leverage up to a factor of 12 times.  However, there is simply no question that the Rockwater Defendants disclosed that the RAM Fund invested in sub-funds which employed leveraged municipal arbitrage strategies.  They disclosed it repeatedly, in the power point presentation discussed at the May 29, 2007 meeting, in the marketing brochure and in the private placement memorandum.

The power point presentation, for example, included a slide entitled "Municipal Arbitrage Risks," that enumerated seven risks which were also identified in the marketing brochure.  The enumerated risks included leverage.  Both the power point presentation and the marketing brochure provided a specific example of leverage, where

28

the sub-manager would use $1 million toward the purchase of a $10 million bond, and obtain the other $9 million from an investor.

Williams testified that the sub-funds in which the RAM Fund invested ran a spectrum of risk, from those that were very conservative, with leverage to a factor of about 2.5, to those that were highly leveraged, with leverage to a factor of about 11.9. But Serrano testified that Williams and Hapke omitted to disclose to her that the sub-funds utilized leverage up to a factor of 12. Indeed, the Rockwater Defendants cite no testimony to contradict this.

That notwithstanding, both the power point presentation and the marketing brochure, as we have stated, disclosed the use of leverage. In addition, the power point presentation encouraged the viewer to ask questions. Serrano testified that the meeting lasted about an hour and a half and that she and her husband, who also has an MBA, asked a lot of questions, mainly about risks. They had every opportunity to ask about the degree of leverage utilized.

Furthermore, we observe the very first page of the marketing brochure stated: "An investment in the [RAM] Fund should be considered speculative and involves certain risks. Please refer to the RAM Private Placement Memorandum . . . for more detailed risk information." And, when Williams sent his June 6, 2007 letter to Colson, via Serrano, he included a copy of the private placement memorandum. That letter stated with respect to the private placement memorandum: "This provides you with information regarding . . . the Fund's investments and strategy . . . . It also discusses the risk of investing in the Fund. You should read the Memorandum carefully."

The private placement memorandum contained two full paragraphs devoted to leverage. It specifically warned: "Due to the highly leveraged nature of the residual certificates, it is possible that these obligations of the Sub Fund would exceed the proceeds from the sale of the municipal bonds, resulting in a loss of all or substantially all of the Sub Fund's value." It also stated: "*There is no restriction on the amount of*

29

*leverage that a Sub Manager may employ* for a Sub Fund and, at any given time, such leverage may be large in relation to the Sub Fund's capital. [¶] . . . As a general matter, the prices of leveraged instruments can be highly volatile, and investments in leveraged instruments may, under certain circumstances, result in losses that exceed the amounts invested." (Italics added.)

Colson acknowledged that he read the private placement memorandum. Therefore, he should have seen that there was no upper limit to the amount of leverage that could be used. He could have asked about the greatest amount of leverage then in use had he chosen to do so. Indeed, the private placement memorandum stated that any questions should be directed to Williams, and it provided his telephone number. However, Colson admitted that he never spoke with Williams about the investment.

### *(iii) risk management techniques*

Hasso also contends that the Rockwater Defendants misdescribed the RAM Fund as having built-in measures designed to minimize risks. However, minimizing risks and eliminating them are two different things. The RAM Fund's risk-minimizing measures were described in the power point presentation, the marketing brochure and the private placement memorandum.

The power point presentation and the marketing brochure each identified seven risks, together with seven corresponding methods of managing those risks. For example, the risk associated with interest rates was managed by hedging. The risk arising out of net asset value fluctuations was tempered by the use of a multi-manager strategy, described elsewhere in the brochure as "[t]he blending of multiple managers with differing expertise and multiple investment styles . . . ." In addition, the page of the marketing brochure addressing the risks and corresponding risk management techniques again stated: "Please refer to the RAM Private Placement Memorandum . . . for more detailed risk information."

30

Although Hasso claims the Rockwater Defendants misrepresented the existence of risk-minimizing measures, it would appear that the unarticulated problem is more fundamentally that the described risk-minimizing measures were not foolproof. They did not save the RAM Fund from catastrophic loss when the global economy collapsed. But Colson knowingly invested in a hedge fund, not a money market account. And, the private placement memorandum specifically warned about "the risk that the Fund's or Sub Fund's investment strategies and/or investment techniques may not work as intended[.]" (Boldface omitted.)

It stated more particularly with respect to hedging, for example: "The success of a Sub Fund's hedging transactions is subject to the Sub Manager's ability to correctly predict movements in and the direction of interest rates. Therefore, while a Sub Fund may enter into such transactions to seek to reduce risk, unanticipated changes in interest rates may result in a poorer overall performance of the Sub Fund than if it had not engaged in any such hedging transaction."

*(iv) proprietary algorithm*

Continuing on, Hasso asserts that Serrano was falsely told the RAM Fund utilized a proprietary algorithm to generate an enhanced return. At trial, Williams described at length the methods he used to select the sub-funds in which the RAM Fund invested. At one point he was asked, "Can you tell us where the secret algorithm comes in . . . ?" Williams replied, "What I withheld was the names of the funds. I didn't want to use the specific names of [the funds] for competitive reasons." He explained that he liked to keep the names of the sub-funds secret at the first meeting, because otherwise prospective clients sometimes just went out and purchased those funds directly, without making a purchase in the RAM Fund. As for why he used the term "algorithm," Williams further explained: "[T]he selection of the funds is a process. And the selection of the funds, you might call that an algorithm."

31

The Pocket Oxford American Dictionary (2d ed. 2008) at page 18 defines an "algorithm" as "a process or set of rules used in calculations or other problem-solving operations." Here, Williams testified at length to the process he used to attack the problem of sub-fund selection. While he did not use calculus, he did apply a process and the use of the term "algorithm" does not appear to have been improper.

*(v) identity of sub-managers*

On a related point, Hasso asserts that, at the May 29, 2007 meeting, the Rockwater Defendants failed to articulate that the sub-fund managers were not RAM Fund employees. Indeed, the power point presentation described the RAM Fund as a "Multi-manager fund of funds" and noted the use of "'Best-in-class' municipal arbitrage sub-managers," without identifying the particular sub-managers.

The marketing brochure was more specific. It stated that "RAM deploy[ed] capital to professional municipal arbitrage managers . . ." and that its assets were invested "in private investment funds and separate accounts managed by top-tier professional money managers . . . ." These statements indicate that the RAM Fund, as a fund-of-funds, invested its assets in other funds, not in house.

The language of the private placement memorandum was even more specific. The private placement memorandum warned of "the risks associated with the Manager's use of third-party investment management firms." (Boldface omitted.) Furthermore, under the topic of management risk, the private placement memorandum stated, in part: "The Fund ordinarily will not have custody or control over the assets it allocates to Sub Funds. As a result, it may be difficult for the Manager to protect the Fund from the risk of Sub Manager fraud, misrepresentation or simple bad judgment. Among other things, a Sub Manager could divert or abscond with the assets allocated to it, fail to follow its stated investment strategy and restrictions, issue false reports or engage in other misconduct. This could result in serious losses to the Fund." This

32

language could not make more plain the fact that the assets were allocated to sub-funds controlled by third party managers, not in-house personnel.

*(vi) margin trading*

Hasso claims the Rockwater Defendants failed to explain, at the May 29, 2007 meeting, that the RAM Fund assets could be subject to margin calls. We first note that Hasso's record references do not really support this assertion. He cites a portion of Serrano's testimony wherein she commented about the investment: "But the problem is, they had it so highly leveraged that I guess they got margin calls and all the assets are gone." This statement simply does not address whether Williams and Hapke did or did not disclose, at the May 29, 2007 meeting, the possible use of buying on margin. We could end our discussion of the point here.

However, we observe the private placement memorandum warned: "In the futures markets, margin deposits typically range between 2% and 15% of the value of the futures contract purchased or sold. Because of these low margin deposits, futures trading is inherently highly leveraged. As a result, a relatively small price movement in a futures contract may result in immediate and substantial losses to the trader." So, even if the topic of buying on margin did not come up at the May 29, 2007 meeting, it is not true that there were no disclosures made on the topic. It was mentioned in the private placement memorandum, which also disclosed risks regarding, inter alia, callable certificates, short sales, options, hedging and leveraging.

*(vii) low-risk investment*

Hasso complains that, after the meeting, Hapke sent Serrano a follow-up email stating: "Our proposed investment strategy is designed to deliver attractive returns with nominal risk, a result that seems ideally suited for the trusts." Despite Hasso's intimation, however, it does not appear that this e-mail was intended to describe the RAM Fund itself as being low risk. Rather, Hapke testified that his e-mail referred to the overall investment proposal, which contained three combined components: (1) the liquid

33

portion, which was very low risk; (2) the CFI-managed core portfolio, which was low risk; and (3) the RAM Fund, which was higher risk. Since the wording of the e-mail refers to the "proposed investment strategy" and not the RAM Fund, this would appear to be a fair characterization of the e-mail.

Moreover, we observe that the investment proposal suggested investing only 50 percent of the trusts' total investment in the RAM Fund, not 100 percent. The proposal allocated 40 percent of the trusts' total investment to the traditional municipal bond portfolio, to be managed by CFI, and 10 percent to the liquid portfolio, also to be managed by CFI. But Colson ignored the recommendation and invested 100 percent in the RAM Fund, thereby exposing the trusts' investments to a higher risk than recommended.

In any event, Hasso's primary complaint appears to be that Williams and Hapke nonetheless opined at the May 29, 2007 meeting that the RAM Fund was a suitable, conservative investment with nominal risk, one appropriate for the preservation of trust assets. According to Serrano, Williams said, "'In the worst case scenario you could lose 10 percent.'" That was supposed to be "'if the world fell apart.'"

Against this backdrop of an apparently wholehearted endorsement of the RAM Fund, we have the more particular disclosures contained in the various written documents, many of which we have described already. However, there are a few more notable disclosures to round out the picture.

The introduction to the investment brochure stated: "*RAM's investment strategy and investment techniques involve significant risks. . . . [¶] An investment in the Fund should be considered speculative . . . .* Please refer to the RAM Private Placement Memorandum . . . for more detailed risk information." (Italics added.)

The first page of the private placement memorandum stated: "An investment in the Fund should be considered speculative and involves substantial risk . . . . You should not invest in the Fund unless you . . . are fully able to sustain the loss of

34

all or a significant part of your investment. In light of this financial risk, you should consider an investment in the Fund only for an appropriate portion of your overall portfolio. [¶] The Manager and the Fund urge you to carefully consider the special considerations and risk factors relating to an investment in the Fund, as described in § 6, 'RISK FACTORS,' and in other sections of this Memorandum . . . ." (Boldface omitted.)

The risk factors identified in section 6 of the private placement memorandum included, among others, "the risk of deterioration in an entire market, such that all or most of the Sub Managers concentrating in that market incur large losses." (Boldface omitted.) The private placement memorandum further warned: "The ability of issuers of municipal bonds to make timely payments of interest and principal may be diminished during general economic downturn . . . ." It also said: "Due to the highly leveraged nature of the residual certificates, it is possible that these obligations of the Sub Fund would exceed the proceeds from the sale of the municipal bonds, resulting in a loss of all or substantially all of the Sub Fund's value."

Clearly, the marketing brochure and the private placement memorandum contained extensive warnings that the RAM Fund could sustain massive losses, particularly in a general economic downturn. When Colson signed the subscription agreements, he represented that he had read the private placement memorandum and that he had relied on it and not on any oral representation inconsistent with it. Furthermore, in both the subscription agreements and a confidential investor qualification questionnaire, Colson further represented that he personally had sufficient knowledge and experience in business and financial matters to be capable of evaluating the risks and merits of an investment in the RAM Fund, and that he was able to suffer a complete loss of the

investment.[6] Colson testified at trial that he read the representations before he signed the document, that each of the representations was accurate, and that he knew "Rockwater" would rely on those representations.

*(viii) analysis*

As the foregoing discussion shows, there is no indication that Hapke and the Rockwater Defendants made any misrepresentations to either Serrano or Colson. While Hasso emphasizes that certain things were not mentioned in the May 29, 2007 meeting, that was an introductory meeting not a seminar addressing every facet of the RAM Fund and every conceivable risk of investing therein. Moreover, on each point with respect to which Hasso said information was lacking, information was provided in the marketing brochure provided to Serrano weeks in advance of the meeting and/or in the private placement memorandum provided before the investment was made. Charles Hartman, Hasso's own expert witness, testified that he saw no misrepresentations in the private placement memorandum and Colson testified that he read it. Furthermore, questions were encouraged and contact information for Williams was provided, but Colson did not contact him for additional information.

The closest thing we have to a misrepresentation is the expression of opinion by Williams and Hapke that the investment was low risk and suitable for the trusts, and the puffery that the most money that could be lost was 10 percent "if the world fell apart." However, Colson acknowledged that, to describe himself modestly, he was a "very, very successful" businessman with a net worth exceeding nine figures. He stated

---

6    Expert witness Taylor testified:  "The investor questionnaire is a document that is sent to the investor for the purpose of determining whether the investor qualifies under an exemption in the securities law that allows the sale of this security to the individual. . . . [P]rivate placements are available to those that have the means to assess them independent of the broker.  And in effect, you have to have the wealth, the understanding, and everything else that goes with it.  So for this transaction to take place, Rockwater had to make sure that the trusts had met certain criteria that allowed them to be an investor in a private placement.  That's [what] the investor questionnaire is designed to do."

he was familiar with financial and business analysis.  He represented to the RAM Fund in multiple documents that he had the requisite business savvy to understand the nature and risks of the RAM Fund and that the trusts could withstand a loss of 100 percent.  Colson admitted at trial that any investment could result in a significant loss and that he knew that was true with respect to the RAM Fund investment.  He further acknowledged that he knew there was no guarantee the most the trust could lose on the RAM Fund investment was 10 percent and that there was the possibility that the entire investment could be lost.

Given the foregoing, the suggestion that Colson could have reasonably relied on such puffery as the risks of investing in the RAM Fund were so minimal that an investment in the RAM Fund could not lose more than 10 percent, is untenable.[7]  The judgment against Hapke and the Rockwater Defendants must be reversed to the extent they are held liable for fraud by intentional representation, fraud by concealment, and negligent misrepresentation.  The judgment in favor of CFI and Fish on those causes of action must be affirmed.  The orders denying Hasso's new trial motion and motion for judgment notwithstanding the verdict with respect to the fraud and misrepresentation causes of action against CFI and Fish must be affirmed.

*E.  BREACH OF FIDUCIARY DUTY:*

---

[7]     It is irrelevant whether Serrano herself may reasonably have relied on the representations in question, inasmuch as she was not the trustee, did not invest the trusts' assets, and is not the plaintiff.  However, we note that inasmuch as she had a bachelor's degree with a major in economics, an MBA, and a juris doctor, and was a paid trustee herself, we have a hard time accepting the notion that she reasonably relied on any representation that the investment could not lose more than 10 percent even "if the world fell apart."

*(1) Introduction—*

"'The elements of a cause of action for breach of fiduciary duty are the existence of a fiduciary relationship, its breach, and damage proximately caused by that breach. [Citation.]' [Citation.]" (*Knox v. Dean* (2012) 205 Cal.App.4th 417, 432.)

"[B]efore a person can be charged with a fiduciary obligation, he must either knowingly undertake to act on behalf and for the benefit of another, or must enter into a relationship which imposes that undertaking as a matter of law. [Citation.]" (*Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 221, superseded by statute on other grounds.) "Fiduciary duties are imposed by law in certain technical, legal relationships such as those between partners or joint venturers [citation], . . . trustees and beneficiaries, principals and agents, and attorneys and clients [citation]." (*GAB Business Services, Inc. v. Lindsey & Newsom Claim Services, Inc.* (2000) 83 Cal.App.4th 409, 416, disapproved on other grounds in *Reeves v. Hanlon* (2004) 33 Cal.4th 1140, 1154.) The investment adviser/client relationship is one such relationship, giving rise to a fiduciary duty as a matter of law. (Cf. *Securities & E. Com'n v. Capital Gains Research Bur.* (1963) 375 U.S. 180, 191, 194.) A fiduciary duty under common law may arise "when one person enters into a confidential relationship with another." (*GAB Business Services, Inc. v. Lindsey & Newsom Claim Services, Inc.*, *supra*, 83 Cal.App.4th at p. 417.) It is a question of fact whether one is either an investment adviser (*James De Nicholas Associates, Inc. v. Heritage Constr. Corp.* (1970) 5 Cal.App.3d 421, 427) or a party to a confidential relationship that gives rise to a fiduciary duty under common law (*GAB Business Services, Inc. v. Lindsey & Newsom Claim Services, Inc.*, *supra*, 83 Cal.App.4th at p. 417; see also *Brown v. Wells Fargo Bank, N.A.* (2008) 168 Cal.App.4th 938, 960-962).

Here, Hapke and the Rockwater Defendants each correctly observe that this case was tried on the theory they were investment advisers. However, they assert that they were not in fact investment advisers. In addition, the Rockwater Defendants claim

the jury instructions were erroneous in that they failed to require the jury to even make findings as to whether they were investment advisers. Finally, the Rockwater Defendants contend the finding that they breached fiduciary duties could not be sustained under the common law inasmuch as the jury had never been instructed on the common law.

In retort, Hasso maintains that each of the parties was indeed an investment adviser within the meaning of California statutory law and that, even if this were not the case, the judgment in his favor should be upheld under common law. He further maintains that he should have prevailed on his breach of fiduciary duty cause of action against CFI and Fish.

As we shall show, it is correct that Hapke was not an investment adviser within the meaning of California statutory law. To the extent the jury instructions were defective for failure to require the jury to make a determination as to whether each defendant was an investment adviser, the error was not prejudicial, at least with respect to RMA and Williams. Given the evidence in the record, even if the jury had specifically been instructed to determine whether RMA and Williams were investment advisers, it is not reasonably probable that the jury would have found that RMA and Williams were not investment advisers. The record contains substantial evidence to show that they were. However, there is no evidence to show that the RAM Fund was an investment adviser. Moreover, because the jury was not instructed in the common law, we do not now apply the common law to determine whether the RAM Fund could have been found to owe a fiduciary duty to Colson. Finally, there is substantial evidence to support the jury's finding that CFI and Fish did not breach any fiduciary duty.

*(2) Hapke—*

Corporations Code section 25009, subdivision (a), provides in pertinent part: "'Investment adviser' means any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing or selling

39

securities, or who, for compensation and as a part of a regular business, publishes analyses or reports concerning securities. 'Investment adviser' does not include. . . (3) an associated person of an investment adviser . . . ."

Hapke says he does not meet the foregoing definition for three separate reasons: (1) he is excluded from the definition because he is "an associated person of an investment adviser"; (2) he does not provide investment advisory services for compensation; and (3) he does not engage in the business of advising others.

*(a) Associated person*

Corporations Code section 25009.5, subdivision (a) defines an "associated person of an investment adviser" as "any partner, officer, director of . . . or other individual, . . . who is employed by or associated with, or subject to the supervision and control of, an investment adviser . . . , and who does any of the following: [¶] (1) Makes any recommendations or otherwise renders advice regarding securities. [¶] . . . [¶] (3) Determines which recommendation or advice regarding securities should be given. [¶] (4) Solicits, offers, or negotiates for the sale or sells investment advisory services. . . ."

Hapke says it is undisputed that RMA is an investment adviser and that he was RMA's chief financial officer, so he is an "associated person of an investment adviser" and as such is expressly excluded from the definition of an "investment adviser." Actually, the Rockwater Defendants do dispute whether RMA is an investment adviser, but RMA's own written materials show that it is.[8] And, no one disputes that Hapke was RMA's chief financial officer. That leaves the question of whether Hapke undertook any of the actions enumerated in section 25009.5, subdivision (a). Hapke overlooks this

---

[8]    To be precise, the investment proposal submitted at the May 29, 2007 meeting stated that Rockwater Hedge, LLC was an investment advisory firm registered with the Department of Corporations. An RMA business plan dated June 15, 2008 stated that "Rockwater Hedge" had joined forces with CFI, through the contribution agreement, and "[t]he new entity [had] been re-named Rockwater Municipal Advisors LLC (RMA)." Hapke confirmed that Rockwater Hedge, LLC became known as RMA, in 2007. The business plan also described RMA as "an investment advisory firm."

question, but it is one we can dispose of simply enough. Hasso's cause of action against Hapke is predicated on the assertion that he rendered advice regarding securities and offered the sale of investment advisory services. For the purposes of this analysis, Hasso is stuck with that assertion.

So, Hapke satisfies all criteria for the definition of an "associated person of an investment adviser" such that he is excluded from the definition of "investment adviser" for the purposes of Corporations Code section 25009, subdivision (a). Hasso provides no reason to dispute this.

However, Hasso claims that the exclusion does not save Hapke from liability for breach of fiduciary duty because, irrespective of the fact that Hapke was an officer of RMA, he was nevertheless an investment adviser in his own right. In other words, Hasso argues that because Hapke rendered investment advisory services, he should held to be an investment adviser in his own right, even though Corporations Code section 25009.5, subdivision (a) specifically states that officers who render investment advisory services are not construed as investment advisers themselves. The obvious import of the statute is to hold liable entity registered investment advisers, but not their officers. Even were we to assume that Hasso's interpretation of the statute is correct, however, we could not conclude that Hapke is an investment adviser in his own right, for reasons we shall show.

*(b) Compensation*

Hapke maintains that he was not an investment adviser, within the meaning of Corporations Code section 25009, subdivision (a), because he was not compensated as such. We agree.

Hapke was chief financial officer of RMA. He was responsible for accounting, tax returns, and books and records, and was involved in the preparation of financial projections, cash flow analysis and the like. He received a flat salary from RMA for his services. Williams testified that neither he nor Hapke received commissions

41

for soliciting investments in the RAM Fund and, more specifically, that Hapke received no compensation for soliciting Colson's investment in the RAM Fund.

The only evidence that Hasso cites in support of the assertion that Hapke was compensated for rendering investment advisory services is evidence that, in January 2008, Hapke's role changed and his salary was cut in half. At that point, Williams put Hapke on commission and asked him to do business development work for the municipal bond business managed by Fish. A couple of months later, Hapke left the company.

This evidence only shows that, after RMA and the RAM Fund were shattered by losses, Williams cut Hapke's salary and asked him to undertake a different job function with respect to the portion of RMA that was still functional—CFI's bond business. It does not show that Hapke was compensated by commission for business development before Colson invested in the RAM Fund in August 2007. There is simply no evidence to show that, at the time of the May 29, 2007 meeting, Hapke was one who received compensation for rendering investment advisory services, so as to qualify him as an investment adviser within the meaning of Corporations Code section 25009.

Hasso disagrees, citing *U.S. v. Elliott* (1995) 62 F.3d 1304. True enough, that case, arising under the Investment Advisors Act of 1940 (15 U.S.C. § 80b-1 et seq.) (hereafter Investment Advisors Act), stated that it was unnecessary for customers to "pay a discrete fee specifically earmarked as payment for investment advice" in order for the defendant to be considered an investment adviser within the meaning of the federal statute. (*U.S. v. Elliott, supra*, 62 F.3d at p. 1311.) Although the two defendants there did not receive separate investment adviser's fees, they were, nonetheless, essentially compensated for providing investment advice. They solicited investments through a Ponzi scheme and were compensated through either the commingling of investor funds and personal funds, in the case of one defendant, or the receipt of commissions, in the case of the other defendant. (*Id.* at pp. 1305-1306.) We need not belabor the distinction between this form of "compensation" and the receipt of a salary by the chief financial

42

officer of a company. Hasso has failed to prove his point.

*(c) Business of advising others*

Hapke also says he was not an investment adviser within the meaning of Corporations Code section 25009, subdivision (a), because he did not engage in the business of advising others. Indeed, as we have seen, the evidence showed he was the chief financial officer of RMA and, as such, performed functions pertaining to accounting, tax returns, books and records, financial projections, cash flow analysis, and the like.

At the same time, Hapke acknowledged that Williams would occasionally ask him to touch base with some of his contacts, such as Attorney Casey, to see if he could introduce the person to the RAM Fund and set up a meeting with Williams. Such a contact resulted in the situation we have here, where Williams and Hapke met with Serrano and pitched a three-tiered investment strategy, in which they hoped to obtain investments in the RAM Fund and CFI.

Even so, for one to be considered an investment adviser, it is generally thought that the individual must provide investment advice on something more than "rare, isolated and nonperiodic" occasions. (*U.S. v. Elliott*, *supra*, 62 F.3d at p. 1310.) Put another way, "*[t]he giving of advice need only be done on such a basis that it constitutes a business activity occurring with some regularity . . . .*" (*Ibid.*) Here, there is no indication that Hapke participated in presentations of this nature with any regularity.

In any event, even if we were to assume that Hapke's client contacts were more than isolated, this would not change the fact that there is no evidence that he was compensated for providing investment advisory services, such that he could properly be found to be an investment adviser. Rather, he was an officer of RMA, and as such was, as we have said, excluded from the definition of investment adviser himself. (Corp. Code, §§ 25009, 25009.5.)

*(3) Rockwater Defendants—*

43

*(a) Jury instructions*

The Rockwater Defendants, as we have noted, contend that they could not properly be held liable for a breach of fiduciary duty unless the jury specifically found that they were each investment advisers as defined in Corporations Code section 25009, which was quoted nearly verbatim in the jury instructions. They also argue that the jury instructions were such that the jurors were unfairly led to simply assume that each Rockwater Defendant was an investment adviser, rather than to understand that they had to first determine whether each individual defendant was an investment adviser at all before even considering whether the respective defendants were liable for breach of fiduciary duty. In addition, the Rockwater Defendants correctly observe that objections were timely made regarding the failure of the instructions to ask the jury to determine whether each individual defendant was an investment adviser before addressing the elements of a breach of fiduciary duty claim.

The jury instructions with respect to breach of fiduciary consisted of five pages. The first page stated in pertinent part: "To establish the claim, the plaintiffs must prove each of the following elements is more likely true than not true: [¶] 1. That plaintiffs were clients or prospective clients of the defendants. [¶] 2. That the defendant acted on behalf of the plaintiffs for purposes of obtaining an investment in the RAM Fund. [¶] 3. That the defendants failed to act as a reasonably careful investment advisor would have acted under the same or similar circumstances. [¶] 4. That the plaintiffs were harmed. [¶] 5. That the Defendants' conduct was a substantial factor in causing the plaintiffs' harm." The jury instructions immediately thereafter continued, on page two: "An investment adviser owes what is known as a fiduciary duty to its clients and prospective clients. . . ." A definition of the term "investment adviser," consistent with Corporations Code sections 25009 and 25009.5, was not provided until the fourth page of the instructions on breach of fiduciary duty.

It is possible to construe the instructions as meaning that as long as the

44

plaintiffs were prospective clients of the defendants, and the defendants were soliciting plaintiffs' investment in the RAM Fund, the defendants owed the plaintiffs the duty to act the way a reasonably careful investment adviser would. Under this construction, the jury was not required to make a determination as to whether the Rockwater Defendants were investment advisers. However, even assuming the jury instructions were erroneous as given, this does not mean that the Rockwater Defendants have shown reversible error.

"A judgment may not be reversed on appeal, even for error involving 'misdirection of the jury,' unless 'after an examination of the entire cause, including the evidence,' it appears the error caused a 'miscarriage of justice.' (Cal. Const., art. VI, § 13.) When the error is one of state law only, it generally does not warrant reversal unless there is a reasonable probability that in the absence of the error, a result more favorable to the appealing party would have been reached. [Citation.]" (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 574.) Put another way, instructional error in a civil case requires reversal "'where it seems probable' that the error 'prejudicially affected the verdict.' [Citations.]" (*Id.* at p. 580.)

Crucial here is the question whether there is a reasonable probability that, had the jury been specifically instructed it must make a finding as to whether each defendant was an investment adviser before proceeding to address the stated elements of a cause of action for breach of fiduciary duty, a result more favorable to the Rockwater Defendants would have been reached. The Rockwater Defendants say the answer is "yes." The Rockwater Defendants contend the evidence clearly showed they were not in fact investment advisers, given that: (1) they never executed an investment advisers contract; (2) they did not engage in the investment adviser business; and (3) they were not compensated for providing investment advice. We turn to those issues now.

*(i) lack of investment advisory contract*

45

The Rockwater Defendants cite *Kassover v. UBS AG* (S.D.N.Y 2008) 619 F.Supp.2d 28 and *Norman v. Salomon Smith Barney Inc.* (S.D.N.Y. 2004) 350 F.Supp.2d 382 in support of their argument that because the parties here did not enter into an investment advisory contract, the Rockwater Defendants were not investment advisers. However, we do not read more into those cases than they say.  They say only that one who is not a party to an investment advisory contract cannot avail himself or herself of the remedies under the Investment Advisors Act.  (*Kassover v. UBS AG*, *supra*, 619 F.Supp.2d at p. 32; *Norman v. Salomon Smith Barney Inc.*, *supra*, 350 F.Supp.2d at p. 388; but see *U.S. v. Elliott*, *supra*, 62 F.3d at pp. 1311-1312 [investment adviser contract not required under federal statutes].)  *Kassover* and *Norman* do not say that one who is not a party to an investment advisory contract cannot assert a viable breach of fiduciary duty claim under other provisions of law or cannot be an investment adviser within the meaning of California Corporations Code section 25009.  Along the same lines, the Rockwater Defendants do not state that Hasso's breach of fiduciary duty cause of action is based on any provision of the Corporate Securities Law of 1968 (Corp. Code, § 25000 et seq.) that is analogous to a provision of the Investment Advisors Act.  As an aside, we also observe that the Rockwater Defendants do not say they requested that the term "investment adviser" be defined for the jury to include only those persons who were parties to investment advisory contracts.  (See *Metcalf v. County of San Joaquin* (2008) 42 Cal.4th 1121, 1130-1131.)  For these various reasons, the failure to sign an investment advisory contract is not determinative for our purposes.

*(ii) rendering investment advice*

The Rockwater Defendants also argue they are not investment advisers because they do not "engage[] in the business of advising others . . . as to the value of securities or as to the advisability of investing in, purchasing or selling securities . . ." within the meaning of Corporations Code section 25009, subdivision (a).

In support of this assertion, they cite evidence regarding the function of

46

Williams in attending the May 29, 2007 meeting. Williams testified that he was at the meeting to speak about the RAM Fund, not to act as an investment adviser. Similarly, expert witness Taylor, called by the Rockwater Defendants, and expert witness Lisa Roth, called by CFI and Fish, each opined that Williams was at the meeting giving a sales pitch, not providing investment advice. However, this opinion was contrary to the one expressed by expert witness Hartman, called by Hasso.

So, what we have here is the battle of the expert witnesses with respect to the function of Williams in attending the May 29, 2007 meeting. However, the simple fact of his attendance is not the only evidence we have.

The first page of the investment proposal stated: "The unique characteristics and objectives of the [2006 May S. Hasso Serrano Family Trust] require a customized and thoughtful investment strategy, a strategy best executed by combining the focused expertise and experience of two specialty investment management firms. [¶] As such, this proposal is presented by the combined investment management firms of [RMA] and [CFI]. [¶] [RMA] and CFI are pleased to present this proposal to provide comprehensive investment services to the Trust."

The proposal presented a "three-tiered investment strategy" combining a "laddered portfolio of diversified traditional municipal bonds," an "investment in a tax-advantaged multi-manager arbitrage strategy," and "[a] smaller, but vital, liquidity portfolio made up primarily of tax-exempt bonds and notes with an average weighted life of fewer than two years." The proposal allocated 40 percent of the trusts' total investment to the traditional municipal bond portfolio, to be managed by CFI, 50 percent to the RAM Fund, and 10 percent to the liquid portfolio, also to be managed by CFI.

The investment proposal stated: "After 25 years of investment experience serving high net worth clients, Bryan Williams formed Rockwater in 2005 as the investment advisor to the [RAM Fund]. Bryan Williams is also the founder, President and CEO of The Rockwater Group, formed in 1998 as an investment advisory firm to

47

high net worth and institutional clients. Both Rockwater and The Rockwater Group are Registered investment Advisory firms registered with the California Department of Corporations." It further stated: "CFI was founded in 1984 and is a Registered Investment Advisor registered with the Securities and Exchange Commission under the investment action of 1940 and the California Department of Corporations." The proposal stated RMA and CFI offered a "highly personalized service" and sought to meet at least annually "to review the performance of the portfolio, confirm goals and objectives, and discuss the investment outlook." The proposal concluded by stating RMA and CFI were "delighted with the opportunity to present [their] proposal to provide investment management services to the Trust."

In short, Williams was pitching a "three-tiered investment strategy" at the same time as he was trying to sell the trusts on making an investment in the RAM Fund as one component part of that ongoing investment strategy. It is difficult to characterize this as something other than rendering investment advice.

### (iii) lack of compensation

The Rockwater Defendants maintain that they could not be found to be investment advisers within the meaning of Corporations Code section 25009, subdivision (a), because they did not receive compensation for providing investment advice. In support of this assertion, the Rockwater Defendants cite the testimony of Serrano, who stated the reason she chose a two-year lockup period on the RAM Fund investment was that with a two-year lockup, no management fees were paid unless there was a profit. However, this evidence bears only upon compensation to RMA, and even at that the Rockwater Defendants are very narrow in their citation to the evidence.

Both the investment proposal and the private placement memorandum specifically addressed the manner in which RMA would receive its compensation. They stated that RMA, as the managing member of the RAM Fund, received compensation from the RAM Fund. Whether that compensation was paid as a management fee or as a

48

profit allocation depended on the class of interest being managed. The private placement memorandum explained that Class A Interests were subject to a two-year lockup and Class B Interests were subject to a one-year lockup. The RAM Fund paid a 1 percent annual management fee on Class B Interests, plus a percentage of profits. It paid no management fee on Class A Interests, but it paid a higher percentage of profits.

So the private placement memorandum showed that while no management fee per se was paid with respect to interests subject to a two-year lockup, a percentage of profits was paid with respect to those interests. This is still compensation. And, in determining whether a person is an investment adviser, this type of compensation can suffice. (*S.E.C. v. Saltzman* (E.D.Pa. 2000) 127 F.Supp.2d 660, 669 [profit-based performance fee constitutes compensation]; see also *U.S. v. Elliott*, *supra*, 62 F.3d at p. 1311 [discrete fee for investment advice not required].) In short, the record is not devoid of evidence that the RAM Fund investment was structured so as to provide compensation to RMA, even though we have no evidence to show that either Williams or the RAM Fund received compensation based on the investment.

However, when it comes to the determination of whether they were investment advisers, Williams and RMA forget three critical points: (1) Williams testified[9] that he was a registered investment adviser; (2) section 2 of the private placement memorandum stated: "Mr. Bryan Williams has over 25 years of successful investment management experience as an investment advisor in Southern California";

and (3) as noted previously, the written materials provided to Serrano stated that RMA

---

9        Williams explained that "[a]n investment adviser is one who registers with a regulatory body in a statement called the form ADV that says what it is that you do and how you get paid for it." He further stated that you generally give a copy to investors. Williams regarded the trusts as potential investors in the RAM Fund and potential clients of CFI. However, the form ADV that was given to the trusts was the form ADV for CFI, not the form ADV for Williams, even though Williams admitted to being a registered investment advisor.

49

was an investment adviser.

*(iv) conclusion*

Given the totality of the evidence, it is not reasonably probable that, had the jury been instructed that it must make a finding as to whether each individual defendant was an investment adviser, the outcome with respect to the breach of fiduciary duty cause of action would have been more favorable to either RMA or Williams. They were registered investment advisers presenting a comprehensive investment strategy in hopes of obtaining investment monies from the trusts.

However, there is a reasonable probability that the outcome would have been more favorable with respect to the RAM Fund. The May 29, 2007 presentation was given by RMA, not the RAM Fund, even though the RAM Fund was one of the available investments described at the meeting. Williams testified that the RAM Fund was not an investment adviser, that it was only a fund. Indeed, this is what the private placement memorandum reflects. We have seen no evidence to the contrary—nothing to show that the RAM Fund itself was in the business of rendering investment advisory services for compensation.

*(b) Colson's testimony*

Separate and apart from their arguments based upon the jury instructions and Corporations Code section 25009, the Rockwater Defendants claim the finding that they breached their fiduciary duties must be reversed because of Colson's testimony alone. Colson testified that while he was empowered by the terms of the trusts to hire investment advisers, he nonetheless had not chosen to hire any investment advisers. Also, Colson testified more specifically that he had not retained either Williams or Hapke as an investment adviser and, for that matter, he had never spoken with either one of them about the risks associated with the RAM Fund investment.

However, the Rockwater Defendants cite no authority to support the

50

proposition that Colson's testimony standing alone is dispositive. To the contrary, the Rockwater Defendants are essentially making a substantial evidence argument. As we have shown already, there is substantial evidence to show that RMA and Williams were investment advisers who sought and obtained investments from Colson, and thus owed him a fiduciary duty. At the same time, there is no substantial evidence to show that the RAM Fund was an investment adviser.

### (c) Common law

Hasso argues that, even if this court holds the Rockwater Defendants were not investment advisers within the meaning of Corporations Code section 25009, we should nonetheless affirm the judgment against the Rockwater Defendants on the breach of fiduciary duty cause of action because they were fiduciaries under common law. Given our holding with respect to RMA and Williams, we need only consider this argument with respect to the RAM Fund.

The Rockwater Defendants argue that the common law on fiduciary duty should not be applied in this matter because the jury was not asked to determine whether a fiduciary relationship arose based on common law. They have a good point. As we have stated, it is a question of fact whether, given the circumstances of the case, there exists a confidential relationship giving rise to a common law fiduciary duty. (*GAB Business Services, Inc. v. Lindsey & Newsom Claim Services, Inc.*, *supra*, 83 Cal.App.4th at p. 417; see also *Brown v. Wells Fargo Bank, N.A.*, *supra*, 168 Cal.App.4th at pp. 960-962.)

However, the jury was not asked to determine whether such a confidential relationship existed. Rather, as the Rockwater Defendants correctly point out, the jury instructions addressed the cause of action only in the context of the fiduciary duty of an investment adviser. Moreover, each party must propose complete and comprehensive jury instructions supporting his or her theory of the case. (*Metcalf v. County of San Joaquin*, *supra*, 42 Cal.4th at pp. 1130-1131.) The Rockwater Defendants are correct

51

that, to the extent Hasso desired that the jury consider a common law theory of breach of fiduciary duty, he should have offered jury instructions on the point. We will not consider a common law theory on which to base liability for breach of fiduciary duty, due to Hasso's failure to offer jury apposite instructions.

*(d) Breach*

We could end our discussion of the breach of fiduciary duty cause of action against RMA and Williams right here. However, we nonetheless choose to show why the evidence did not support a cause of action for fraud but did support a cause of action for breach of fiduciary duty—a point RMA and Williams do not discuss.

Expert witness Hartman opined that there was a breach of fiduciary duty in connection with the May 29 meeting and the materials discussed at that time. He stated that the investment advisers had a duty, at the May 29 meeting, to provide a balanced presentation as to the advantages and disadvantages of the proposed investment and to make sure the prospective client fully understood the nature of the services being proposed. He further said that the investment proposal and the power point presentation provided a better disclosure of the advantages than of the disadvantages, and that the risks were understated. In particular, he said the materials presented at the meeting failed to disclose the amount of leverage.

On a related note, Hartman expressed his understanding that Serrano had made plain that the trusts' investment objective was capital preservation and that there was a willingness to take conservative risk to obtain an enhanced return to the extent consistent with that objective. However, he explained that an investment adviser who makes a recommendation not in conformity with a prospective client's objectives has a duty to explain the risks fully to make certain the client understands the risks. He reiterated that, in this case, the investment proposal and the presentation failed to fully explain the risks in terms of the amount of leverage.

Indeed, as we have noted, Williams testified that the sub-funds were

52

leveraged from 2.5 to 11.9 times.  However, Serrano said she was not told that the investment would be leveraged up to 12 times.  Serrano repeatedly testified that she told Williams and Hapke that the objective was capital preservation and that she understood based on their presentation that the investment was a low-risk investment well suited for the trusts.  Given the totality of Serrano's testimony, the jury could infer that had the amount of leverage been disclosed in the meeting, Serrano would not have recommended to Colson that he make an investment in the RAM Fund, Colson would not have invested, and the trust monies would not have been lost.

*(4)  CFI and Fish—*

In his appeal, Hasso argues he should have prevailed against CFI and Fish on the breach of fiduciary duty cause of action.  He asserts that the court erred in failing to grant his motions for judgment notwithstanding the verdict and for a new trial with respect to the breach of fiduciary duty cause of action as against CFI and Fish.

In order to prevail on his cause of action for breach of fiduciary duty, Hasso had the burden to prove the existence of a fiduciary relationship, a breach of that duty, and damages proximately caused by the breach.  (*Knox v. Dean*, *supra*, 205 Cal.App.4th at p. 432; *Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 820-821.)  We first observe there is no dispute that CFI was a registered investment adviser.  Consequently, it owed a fiduciary duty to its clients and prospective clients.  (Cf. *Securities & E. Com'n v. Capital Gains Research Bur.*, *supra*, 375 U.S. at pp. 191, 194.)

Hasso says both CFI and Fish owed fiduciary duties to Colson because the May 29, 2007 presentation was made on behalf of RMA and CFI jointly and the investment proposal pitched investments in both the RAM Fund and CFI.  Consequently, he argues, Colson, as the intended recipient of the investment proposal, was not only the prospective client of CFI, but after investing in the RAM Fund, was also the actual client of CFI.  He says CFI and Fish "breached their fiduciary duty by crafting the deceptive presentation" and persuading Colson "to invest $6 million in the RAM Fund, whose

53

leveraged municipal arbitrage strategy was antithetical to [the] goals of capital preservation and safe, tax-advantaged yield." Hasso maintains that it is irrelevant that Fish did not attend the presentation or that Colson did not invest in any assets managed by CFI.

We first note that the May 29, 2007 presentation was given about six months before CFI officially joined up with RMA pursuant to the contribution agreement. Nonetheless, the investment proposal itself stated that it was "presented by the combined investment management firms of [RMA] and [CFI]." And, the investment proposal clearly recommended investments in both the RAM Fund, managed by RMA, and traditional municipal bonds and liquid short-term investments, managed by CFI. Similarly, the investment proposal showed that RMA would be compensated with respect to the portion of the portfolio invested in the RAM Fund and CFI would earn a management fee on the portions of the portfolio it managed.

In weighing this information, the jury nonetheless did not find either CFI or Fish liable for breach of fiduciary duty. Neither Fish nor any other representative of CFI attended the meeting or made any verbal representation to Serrano. True, one could infer that because CFI was listed as a presenter of the investment proposal, it recommended all investments mentioned in that proposal, both those it would manage and with respect to which it would earn fees and those it would not manage and with respect to which it would earn no fees. However, one could also infer that CFI recommended only the investments that it would manage and with respect to which it would earn fees. It is not up to this court to reweigh the evidence. (*In re Marriage of Balcof* (2006) 141 Cal.App.4th 1509, 1531.) Here, substantial evidence supports the implied finding that CFI and Fish breached no duty in connection with the May 29, 2007 meeting and the investment proposal. (*Virtanen v. O'Connell* (2006) 140 Cal.App.4th 688, 709.)

Consequently, Hasso has failed to meet his burden to show error in the

54

judgment on the breach of fiduciary duty claim against CFI and Fish or in the order denying the motion for judgment notwithstanding the verdict on that claim. (*Wolf v. Walt Disney Pictures & Television*, *supra*, 162 Cal.App.4th at p. 1138.) Similarly, he has failed to show that the court abused its discretion in denying the new trial motion on that claim. (*Fassberg Construction Co. v. Housing Authority of City of Los Angeles*, *supra*, 152 Cal.App.4th at pp. 751-752.)

## F. *PROFESSIONAL NEGLIGENCE:*

"The elements of a cause of action for professional negligence are (1) the existence of the duty of the professional to use such skill, prudence, and diligence as other members of the profession commonly possess and exercise; (2) breach of that duty; (3) a causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the professional negligence. [Citation.]" (*Oasis West Realty, LLC v. Goldman*, *supra*, 51 Cal.4th at p. 821.)

The professional negligence cause of action was tried on the theory that Hapke and the Rockwater Defendants were investment advisers who failed "to use the skill and care that a reasonably careful investment advisor would have used in similar circumstances." Because the breach of fiduciary duty cause of action was also based on the assertion that Hapke and the Rockwater Defendants were investment advisers, they and Hasso offer perfunctory arguments that essentially state the professional negligence cause of action should rise or fall the same way as the breach of fiduciary duty cause of action.

As we have already stated, Hapke and the RAM Fund were not investment advisers. This being the case, they are not liable for professional negligence based on the duties of an investment adviser any more than they are liable for breach of the duty of an investment adviser. That leaves Williams and RMA.

Williams and RMA say that given the lack of either reliance or reasonable

55

reliance on their conduct, any negligence on their part could not have been a substantial factor in causing harm to the trusts. In so stating, they provide no citations to legal authority and no citations to the record. Perhaps they expect this court to extrapolate from their arguments under the fraud topic headings and apply those arguments in the professional negligence context. We decline to do so.

As we have already discussed, the evidence does not support a cause of action based on fraudulent misrepresentation or omission, but does support a cause of action based on breach of fiduciary duty. We noted that expert witness Hartman testified as to the nature of an investment adviser's fiduciary duty and the breach of that duty in this case. Williams and RMA make no mention of Hartman's testimony on these points and certainly do not tell us whether there should be any distinctions in the context of professional negligence. We do not intend to research the matter on our own. (*Paterno v. State of California* (1999) 74 Cal.App.4th 68, 106.) Inasmuch as Williams and RMA have failed to provide record references or citations to authority in support of their argument, their argument is waived. (*Roden v. AmerisourceBergen Corp.* (2010) 186 Cal.App.4th 620, 648.)

## G. HASSO'S EQUITABLE CLAIMS REGARDING CFI AND FISH:

### (1) Introduction—

In his appeal, Hasso requests this court to: (1) reverse the portion of the judgment regarding the ruling on his equitable theories of alter ego and single enterprise; and (2) remand the matter to the trial court with directions to enter new findings that RMA and CFI are jointly and severally liable to him, and that CFI and Fish are jointly and severally liable to him. In other words, Hasso seeks to have CFI held liable to the same extent as RMA, on the basis of single enterprise liability, and then to have Fish held liable to the same extent as CFI, on the basis of alter ego liability. As we shall show, substantial evidence supports the trial court's finding that RMA and CFI were not a

56

single enterprise, so CFI was not liable for the debts of RMA. Furthermore, inasmuch as we affirm the judgment in favor of CFI on all grounds, we need not address whether the court erred in finding that Fish was not the alter ego of CFI.

*(2) Principles of law—*

"In California, two conditions must be met before the alter ego doctrine will be invoked. First, there must be such a unity of interest and ownership between the corporation and its equitable owner that the separate personalities of the corporation and the shareholder do not in reality exist. Second, there must be an inequitable result if the acts in question are treated as those of the corporation alone. [Citations.] 'Among the factors to be considered in applying the doctrine are commingling of funds and other assets of the two entities, the holding out by one entity that it is liable for the debts of the other, identical equitable ownership in the two entities, use of the same offices and employees, and use of one as a mere shell or conduit for the affairs of the other.' [Citations.] Other factors which have been described in the case law include inadequate capitalization, disregard of corporate formalities, lack of segregation of corporate records, and identical directors and officers. [Citations.] No one characteristic governs, but the courts must look at all the circumstances to determine whether the doctrine should be applied. [Citation.] Alter ego is an extreme remedy, sparingly used. [Citation.]" (*Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523, 538-539; see also *Greenspan v. LADT LLC* (2010) 191 Cal.App.4th 486, 510-513.)

"'Generally, alter ego liability is reserved for the parent-subsidiary relationship. However, under the single-enterprise rule, liability can be found between sister companies. The theory has been described as follows: "'In effect what happens is that the court, for sufficient reason, has determined that though there are two or more personalities, there is but one enterprise; and that this enterprise has been so handled that it should respond, as a whole, for the debts of certain component elements of it. . . .'"' [Citations.]" (*Greenspan v. LADT LLC*, *supra*, 191 Cal.App.4th at p. 512.)

57

Whether alter ego has been established "'is primarily a question of fact which should not be disturbed when supported by substantial evidence.' [Citation.]" (*Greenspan v. LADT LLC*, *supra*, 191 Cal.App.4th at p. 512.)

*(3) Statement of decision—*

The court stated at the outset that Hasso had failed to prove that either Fish or CFI had acted in bad faith or engaged in misconduct so as to justify the application of either the alter ego or the single enterprise doctrine. Citing *Sonora Diamond Corp. v. Superior Court*, *supra*, 83 Cal.App.4th at page 539, the court held that without evidence of wrongdoing by Fish or CFI, one of the two essential elements of the alter ego doctrine could not be established. The court noted that in phase I, the jury had found in favor of Fish and CFI on causes of action for fraud, concealment, breach of fiduciary duty, and professional negligence. It further stated that in phase III, Hasso had failed to present sufficient evidence of bad faith.

The court also found that Hasso had failed to show that the failure to hold Fish or CFI liable would result in injustice or inequity. Finally, the court found that Hasso had failed either to present sufficient evidence of a unity of interest between CFI and RMA to establish single enterprise liability or to present sufficient evidence of a unity of interest between CFI and Fish to establish alter ego liability.

With regard to the purported unity of interest between CFI and RMA, the court summarized the testimony of Hasso's expert witness, certified public accountant and certified fraud examiner Michael Spindler, in the following manner: "Plaintiffs' expert witness . . . testified that CFI did not dominate or control RMA. He did <u>not</u> find that CFI and RMA shared common ownership or that CFI used RMA as a mere conduit for its affairs. He further testified that after the Contribution Agreement, Defendant Bryan Williams was the President, managing member and controlling shareholder of RMA. Spindler further agreed that CFI was not involved in RMA's business operations.

"Spindler, a forensic accountant, also testified that he found no evidence

58

that CFI and RMA commingled assets.  CFI maintained separate bank accounts, separate credit card accounts, separate accounting books and filed its own tax returns.  CFI and RMA maintained their own legal formalities.  CFI maintained its corporate status with the California Secretary of State, it maintained a board of directors, it held board of directors meetings, and board members voted on important corporate actions.  In addition, dealings between CFI and RMA involved written contracts (i.e., Contribution Agreement), and CFI and RMA were each represented in such transactions by separate counsel.  None of the factors Spindler identified in support of Plaintiffs' single enterprise claim show that CFI held itself out as liable for RMA's debts.  CFI and RMA did not share ownership of any assets.  CFI and RMA did not share obligations for any liabilities.  CFI never held any of Plaintiffs' assets.  CFI never agreed to pay any of RMA's liabilities.  None of RMA's controlling shareholders or managing members has ever been a CFI employee or a member of CFI's board of directors.  Finally, Spindler found no evidence that RMA was undercapitalized."  (Record references omitted.)

*(4)  Substantial Evidence Regarding RMA and CFI—*

We have reviewed the testimony of Spindler in its entirety and see that it fully supports the court's characterization.  However, we also observe that the foregoing testimony notwithstanding, Spindler opined that CFI and RMA were a single enterprise, as least from the time they entered into the contribution agreement and until the time of the unwind agreement.  As he put it, after the contribution agreement was signed, "CFI . . . and RMA essentially became one."  In addition, he provided certain testimony that would support factors in favor of a finding of a unity of interest between CFI and RMA.

Nonetheless, we need not detail all that testimony here.  Suffice it to say, as the trial court well showed, Spindler provided ample testimony in support of factors contrary to a finding of a unity of interest, so much so, that we need not even address the testimony of Professor Hugh Friedman, the expert witness of Fish and CFI.  Without question, the testimony of Spindler alone provided substantial evidence in support of the

59

court's finding that there was a lack of unity of interest between CFI and RMA, such that CFI was not liable for the debts of RMA on the basis of single enterprise liability.

III

DISPOSITION

The judgment against RMA and Williams for fraud by intentional misrepresentation, fraud by concealment, negligent misrepresentation and actual and constructive fraudulent conveyance is reversed. The judgment against RMA and Williams for breach of fiduciary duty and professional negligence is affirmed. The orders on the Rockwater Defendants' motions for new trial and for judgment notwithstanding the verdict are moot.

The judgment against the RAM Fund is reversed.

The judgment against Hapke is reversed. The order denying his motion for judgment notwithstanding the verdict is moot.

The judgment in favor of CFI and Fish is affirmed. The orders denying Hasso's motions for judgment notwithstanding the verdict and for new trial are affirmed.

Hapke, CFI and Fish shall receive their costs on appeal. Hasso and the Rockwater Defendants shall bear their own costs on appeal.


MOORE, J.

WE CONCUR:


O'LEARY, P. J.


RYLAARSDAM, J.


60